1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2          CIVIL CASE NUMBER: 1:23-cv-11018-NMG

3    _____

4    MICHAEL BARRETT, on behalf of
     himself and all others similarly
5    situated,

6          Plaintiffs,

7        vs.

8    THE GARAGE CARS, LLC d/b/a
     THE GARAGE,
9
          Defendant.
10   _____

11

12        VIDEOCONFERENCE 30(b)(6) DEPOSITION OF
                   GARAGE CARS, LLC,
13              BY AND THROUGH
                 ERIC SCHNEIDER

14

15              Monday, June 10, 2024
16                  9:33 a.m.

17

             Remote Proceeding
18          Cambridge, Massachusetts

19

20

21              Shayne Colomy
             Digital Reporter
22        Commission No. 50205784

23

24



800.211.DEPO (3376)
EsquireSolutions.com

1                    APPEARANCES OF COUNSEL

2    On behalf of Michael Barrett, Plaintiffs:

3         YITZCHAK ZELMAN, ESQ.
          MARCUS & ZELMAN
4         701 Cookman Avenue
          Suite 300
5         Asbury Park, New Jersey 07712
          732-695-3282
6         yzelman@marcuszelman.com
          APPEARED VIA VIDEOCONFERENCE

7

8    On behalf of The Garage Cars, LLC d/b/a The Garage,
     Defendant:

9

          ERIC R. LEBLANC, ESQ.
10        BENNETT & BELFORT
          24 Thorndike Street
11        Suite 300
          Cambridge, Massachusetts 02141
12        617-577-8800
          eleblanc@bennettandbelfort.com
13        APPEARED VIA VIDEOCONFERENCE

14

15

16

17

18

19

20

21

22

23

24



```
1                    INDEX TO EXAMINATION

2    EXAMINATION OF ERIC SCHNEIDER                   PAGE

3    Examination by Mr. Zelman                         5

4

5

6

7         (There were no exhibits identified during

8    this proceeding.)

9

10

11

12                    CERTIFIED QUESTION

13   Page 7, Line 21

14        Q.   Now, there is currently an entity named The

15   Garage selling cars in Massachusetts, correct?

16

17

18

19

20

21

22

23

24
```



1           THE REPORTER:  We are now on the record.  The

2    time is 9:33 a.m. on June the 10th, 2024.  We are here

3    to take the deposition of Eric Schneider in the case of

4    Michael Barrett v. The Garage Cars, LLC.

5           Good morning, everyone.  My name is Shayne

6    Colomy, notary public and digital reporter for Esquire

7    Deposition Solutions in the state of New Jersey.  I'll

8    be capturing the verbatim record of today's proceeding,

9    using electronic audio equipment, a computer, and

10   specialized recording software, which is not a form of

11   stenography.

12          The witness is located in Cambridge,

13   Massachusetts, and does not have the local authority

14   present to administer the oath to them.

15          In lieu of my administering the oath to this

16   witness, I would ask that all parties stipulate that

17   the witness has identified himself as Eric Schneider,

18   and that the witness' testimony will be treated as if

19   given under oath, and that the final transcript may be

20   used for all purposes allowed by the local Rules of

21   Civil Procedure.

22          Can you verbalize your agreement to this

23   stipulation by stating your name, your firm, and who

24   you represent in this matter.



 1              MR. ZELMAN:  Yitzchak Zelman, for Marcus &

 2   Zelman, representing the Plaintiff; so stipulated.

 3              MR. LEBLANC:  Eric LeBlanc from Bennett &

 4   Belfort.  I just want to make a clarification that we

 5   are here for the 30(b)(6) deposition of Garage Cars,

 6   LLC, not the individual deposition of Mr. Schneider,

 7   and we so stipulate.

 8              THE REPORTER:  Understood.  Thank you.

 9              Counsel, this witness is yours.

10              MR. ZELMAN:  Thank you.

11                      EXAMINATION

12   BY MR. ZELMAN:

13       Q.   Good morning.  My name is Yitzchak Zelman, and

14   I represent the plaintiff, Michael Barrett, in this

15   action.

16              Can you please state your name for the record.

17       A.   Eric Schneider.

18              MR. LEBLANC:  And Yitzchak, can you please put

19   the stipulations on the record?

20              MR. ZELMAN:  Sure.  Just all objections are

21   reserved for the time of trial, except for form, right?

22   Other than that --

23              MR. LEBLANC:  Motions to strike are reserved.

24              MR. ZELMAN:  Motions to strike are reserved



 1  for time of trial, as well.  Anything else?

 2          MR. LEBLANC:  Witness will be given 30 days to

 3  read and sign.

 4          MR. ZELMAN:  Sure.

 5          MR. LEBLANC:  And to the extent required,

 6  notary is waived.

 7          MR. ZELMAN:  Okay.  Understood.

 8  BY MR. ZELMAN:

 9      Q.  Mr. Schneider, you understand that you're

10  testifying here today on behalf of The Garage Cars,

11  LLC, doing business as The Garage?

12      A.  Yes.

13          THE REPORTER:  Apologies, Counsel.  My

14  Internet just cut out for a bit.  Could you just repeat

15  that last question?

16  BY MR. ZELMAN:

17      Q.  Sure.  Mr. Schneider, you understand you're

18  testifying here today on behalf of The Garage Cars,

19  LLC, doing business as The Garage?

20      A.  Yes.

21      Q.  All right.  For purposes of today's

22  deposition, I'll just refer to that company as The

23  Garage.  Is that all right with you?

24      A.  Yes.



1      Q.   What is your role with that company?

2           MR. LEBLANC:  Objection.

3           THE WITNESS:  That company is no longer in

4    business.

5    BY MR. ZELMAN:

6      Q.   Okay.  What was your role with that company

7    when it was in business?

8      A.   I was the president.

9      Q.   Were you also the manager?

10     A.   I believe so, yes.

11     Q.   Okay.  When did that company go out of

12   business?

13     A.   In 2021, I believe, December of '21.

14     Q.   Okay.  And what business was that in?

15     A.   I'm sorry?

16     Q.   What business was The Garage in?

17     A.   I -- I don't understand the question.

18     Q.   The Garage, did it sell produce?

19     A.   Oh, excuse me.  It was an automobile

20   dealership.

21     Q.   Okay.  Thank you.  Now, there is currently an

22   entity named The Garage selling cars in Massachusetts,

23   correct?

24          MR. LEBLANC:  Objection.  Outside the scope.



1    You can ask about the -- the entity that's been sued.

2              MR. ZELMAN:  I understand.

3    BY MR. ZELMAN:

4         Q.    You can answer, Mr. Schneider.

5              MR. LEBLANC:  No.  I'm -- I'm instructing you

6    not to answer.  That's outside the scope of your

7    30(b)(6).

8              MR. ZELMAN:  I understand.  The only time you

9    can instruct a witness not to answer a question is if

10   you're moving to limit or terminate the deposition

11   because I'm harassing or abusing the witness.

12             Is that what you're doing right now?

13             MR. LEBLANC:  You are going outside the bounds

14   of your 30(b)(6) notice.  The witness has nothing

15   prepared on that topic.

16             MR. ZELMAN:  I understand.  So he can testify

17   as to his personal knowledge.  Again, there's very few

18   times under the FRCP you can instruct the witness not

19   to answer.  If you are doing so now, we can get the

20   Court on the line.

21             Is that your intention?

22             MR. LEBLANC:  We can certify this question.

23             And go ahead and answer the question,

24   Mr. Schneider.



ERIC SCHNEIDER 30(6)(B)                                June 10, 2024
BARRETT vs GARAGE CARS, LLC.                                  9

```
 1              THE WITNESS:  What is the question?

 2   BY MR. ZELMAN:

 3       Q.   This question was simply this: There is an

 4   entity named The Garage selling vehicles in

 5   Massachusetts, as of today's date, correct?

 6              MR. LEBLANC:  Objection.

 7              You can answer.

 8              THE WITNESS:  Yes.

 9   BY MR. ZELMAN:

10       Q.   And that's got two locations?

11              MR. LEBLANC:  Objection.

12              You can answer.

13              THE WITNESS:  Yes.

14   BY MR. ZELMAN:

15       Q.   One location is in Brockton, one location is

16   in Whitman?

17              MR. LEBLANC:  Objection.

18              You can answer.

19              THE WITNESS:  Yes.

20   BY MR. ZELMAN:

21       Q.   The location that we're going to be talking

22   about today, the dealership -- I'm sorry.  Let me

23   rephrase.

24              The dealership that closed, that was located
```



```
 1   in -- where was it located?  I'm sorry.
 2        A.    Bridgewater.
 3        Q.    I'm sorry.  What -- what was the answer?
 4        A.    Bridgewater.
 5        Q.    Oh, Bridgewater.  That -- correct.  Was that
 6   the third location of this entity?
 7              MR. LEBLANC:  Objection.
 8              THE WITNESS:  Yes.
 9   BY MR. ZELMAN:
10        Q.    Okay.  Why did this location close?
11        A.    Due to a lack of business.
12        Q.    Are you also the president or manager of the
13   other two locations?
14              MR. LEBLANC:  Objection.
15              You can answer.
16              THE WITNESS:  I am.
17   BY MR. ZELMAN:
18        Q.    Sorry if I missed this, did you say the
19   business -- this location closed at the end of 2021?
20        A.    It was December of 2021.
21        Q.    What happened to the cars that were at that
22   location?
23              MR. LEBLANC:  Objection.
24              THE WITNESS:  There were no longer any
```



 1  vehicles there at the end of the business.

 2  BY MR. ZELMAN:

 3      Q.   Was it a matter of you sold every last one at

 4  that location or did they move to another location?

 5      A.   From the best of my memory, I believe we sold

 6  them.

 7      Q.   Okay.  What did you do with all the records

 8  relating to the vehicles sold from that dealership?

 9      A.   What do I do or what did I do?

10      Q.   Well, what did you do?

11      A.   We had them kept in folders.

12      Q.   Do you still have them?

13      A.   No, I do not.

14      Q.   Who does?

15      A.   They were thrown away by my ex-landlord.

16      Q.   The landlord of the Bridgewater location?

17      A.   Correct.

18          THE REPORTER:  Sorry.  One more time, Counsel.

19          MR. ZELMAN:  I was just saying the landlord of

20  the Bridgewater location.

21          THE REPORTER:  Thank you.

22          MR. LEBLANC:  Did you get the answer,

23  Mr. Colomy?

24          THE REPORTER:  I believe he said, "Yes."



1          MR. LEBLANC:  He said, "Correct."

2          THE REPORTER:  Yeah.  Oh, thank you.

3    BY MR. ZELMAN:

4        Q.   What was your ex-landlord's name?

5        A.   Thomas Cahill.

6        Q.   Did you or anyone else at The Garage ask

7    Mr. Cahill to throw them away?

8        A.   No.

9        Q.   Why did he do that?

10         MR. LEBLANC:  Objection.

11         You can answer.

12         THE WITNESS:  Because I was no longer his

13   tenant, and he had already rented the place out to

14   somebody else and they were taking up space, he said.

15   BY MR. ZELMAN:

16       Q.   Okay.  Do you have any other records relating

17   to the vehicles sold out of that location?

18       A.   I do not.

19       Q.   Do you have any electronic backups?

20       A.   No.

21       Q.   Okay.  In this case, we're going to be talking

22   about a vehicle that was sold to my client, Michael

23   Barrett.

24         You have documents relating to that sale,



1   correct?

2          A.   Yes.

3          Q.   How is that?

4          A.   I went to retrieve the record after I found --

5   after I received a Complaint, I went to retrieve those

6   records.  That is when I found out that I needed the

7   folder.

8          Q.   How did you retrieve those records?

9          A.   I went to the last known location of the boxes

10  and I pulled the folder out.

11         Q.   What was the last known location of the box?

12         A.   In the office corner of where we used to lease

13  the -- lease the office.

14         Q.   When did you do that?

15         A.   After I received the Complaint.

16         Q.   When you say "the Complaint," are you

17  referring to the Complaint that initiated this lawsuit?

18         A.   Yes.

19         Q.   Have you read the Complaint filed in this

20  lawsuit?

21         A.   Yes.

22         Q.   And the Complaint alleges claims on behalf of

23  Mr. Barrett and also on behalf of a class of similarly

24  situated individuals.



 1          Do you know what a class action is?
 2          MR. LEBLANC:  Objection.
 3          To the extent that would implicate
 4  attorney-client privilege, I would instruct you not to
 5  answer.  If you have independent knowledge of what a
 6  class action lawsuit is, you may answer.
 7          THE WITNESS:  I do know.
 8  BY MR. ZELMAN:
 9     Q.   Okay.  And so when you received that Complaint
10  on behalf of Mr. Barrett, you understood that the case
11  was not just referring to the claims -- I'm sorry, the
12  sale of the vehicle to Mr. Barrett, but the sale of
13  vehicles to a number of The Garage's customers?
14          MR. LEBLANC:  Objection.
15          THE WITNESS:  I did not know.
16  BY MR. ZELMAN:
17     Q.   You said you read the Complaint, though,
18  right?
19     A.   I did.
20     Q.   Okay.  Did you read the section where the
21  Complaint states that, "Plaintiff therefore brings this
22  claim on behalf of himself and a class of similarly
23  situated consumers pursuant to Civil Rule 23"?
24     A.   I did not read it thoroughly and understand



 1   that.

 2       Q.   When you retrieved the file for Mr. Barrett's

 3   sale, why did you not retrieve the remaining records

 4   you had in this location that you no longer were

 5   occupying?

 6            MR. LEBLANC:  Objection.

 7            You can answer.

 8            THE WITNESS:  I grabbed what I thought was

 9   what I needed at that point in time and planned on

10   going back to take the rest at a more convenient time.

11   BY MR. ZELMAN:

12       Q.   Okay.  How soon after that were these boxes

13   thrown out by your ex-landlord?

14            MR. LEBLANC:  Objection.

15            THE WITNESS:  I'm not sure.

16   BY MR. ZELMAN:

17       Q.   What is your ex-landlord's phone number?

18       A.   I don't know.

19       Q.   What is your ex-landlord's address?

20       A.   I don't know.

21       Q.   How long was your company a tenant of

22   Mr. Cahill?

23       A.   I believe four or five years.  I don't really

24   remember exactly.



1      Q.   And during that time, you would communicate

2   with Mr. Cahill when needed?

3      A.   When needed.

4      Q.   And you would do that by phone?

5      A.   I -- I don't remember.

6      Q.   Do you remember communicating by phone with

7   Mr. Cahill at any time?

8      A.   I don't remember.

9      Q.   Okay.  Mr. Cahill was your landlord for four

10  or five years, but you don't have his phone number saved

11  in your -- in your phone?

12     A.   I do not.

13     Q.   What was the address of the Bridgewater

14  location?

15     A.   I believe it was 4 -- 456 Bedford Street or

16  465 Bedford Street.  I can't remember exactly.

17     Q.   As a dealer in Massachusetts, are you aware

18  that you need to keep a title log of vehicles that come

19  in and it gets sold?

20          MR. LEBLANC:  Objection.

21          To the extent that would come from counsel, I

22  would instruct you not to answer.  To the extent you

23  have independent knowledge, you may answer.

24          THE WITNESS:  I am.



 1   BY MR. ZELMAN:

 2        Q.   Okay.  Do you still have that title log for

 3   the Bridgewater location?

 4             MR. LEBLANC:  Objection.

 5             THE WITNESS:  No.

 6   BY MR. ZELMAN:

 7        Q.   Where is it?

 8        A.   It was thrown away with the records.

 9        Q.   In this case, Mr. Schneider, we're trying to

10   identify the individuals who purchased vehicles from

11   The Garage in the four-year period leading up to the

12   filing of this lawsuit.

13             Do you have any way to identify those

14   individuals?

15        A.   No.

16        Q.   Can you identify some of those individuals?

17        A.   No.

18        Q.   Okay.  Have you tried?

19        A.   No.

20        Q.   Why not?

21             MR. LEBLANC:  Objection.

22   BY MR. ZELMAN:

23        Q.   Mr. Schneider, you can answer.

24        A.   I'm sorry.  What is the question?



1        Q.   I asked why not.

2             MR. LEBLANC:  Why haven't you tried to

3    identify those individuals?

4             THE WITNESS:  I wouldn't know how.

5    BY MR. ZELMAN:

6        Q.   Okay.  Who is Lauren Silver?

7             THE REPORTER:  I'm sorry.  Could you repeat

8    that?

9    BY MR. ZELMAN:

10       Q.   Who is Lauren Silver?

11       A.   She was the salesperson.

12       Q.   At the Bridgewater location?

13       A.   Correct.  Yes.

14       Q.   Does she still work for any of the other

15   locations?

16       A.   Yes.

17       Q.   Okay.  What location does she work at?  Or

18   does she work just for the company in general?

19            MR. LEBLANC:  Objection.

20            You can answer.

21            THE WITNESS:  She works for the company.

22   BY MR. ZELMAN:

23       Q.   What does she do?

24       A.   She sells automobiles.



1        Q.   And she doesn't do that at a specific

2    location?  She bounces around from location to

3    location?  How does that work?

4        A.   She works where she's needed.

5        Q.   Is that the case for most of the employees of

6    The Garage?  Do they go from location to location as

7    needed?

8             MR. LEBLANC:  Objection.

9             THE WITNESS:  At times.

10   BY MR. ZELMAN:

11       Q.   When Bridgewater was opened, was that the same

12   arrangement; Lauren or the other employees would go

13   from location to location, including Bridgewater, as

14   needed?

15       A.   No.

16       Q.   How did that differ?

17       A.   Business has changed.

18       Q.   How so?

19       A.   Things have gotten slower.

20       Q.   Things have gotten slower now?

21       A.   Yes.

22       Q.   By that answer, I assume that back in 2020 or

23   2021, business was more active?

24       A.   No.



1      Q.    Then what do you mean business got slower?  I

2  thought I was making a logical conclusion there.

3      A.    We don't need the same amount of people as we

4  did at one point in time.

5      Q.    Okay.  So when Lauren was working at the

6  Bridgewater location back in 2020 or 2021, was she just

7  working at the Bridgewater location at that time, or

8  was she also going between locations at that time?

9      A.    She was in Bridgewater.

10     Q.    As a president/manager, you would go between

11  the different locations?

12     A.    No.

13     Q.    Where would you be?

14     A.    I worked virtual for a period of time during

15  COVID.

16     Q.    So were you at all locations, but of none?

17     A.    I -- I would -- I would go to each location as

18  needed, but I was not set in any one location permanent.

19     Q.    I remember those times.  A lot of us were

20  working at home, if possible.  Was that the case for a

21  lot of The Garage employees?

22     A.    Yes.

23     Q.    So would a lot of them also work virtually at

24  the different locations as needed?



```
 1               MR. LEBLANC:  Objection.

 2               THE WITNESS:  No.

 3    BY MR. ZELMAN:

 4        Q.   Who would?

 5        A.   I don't remember.

 6        Q.   How many people does The Garage employ overall

 7    roughly?

 8               MR. LEBLANC:  Objection.  Before we go too

 9    much further, when you're referring to The Garage,

10    you're referring to the entity that's been named as the

11    30(b)(6) deponent, right?

12               MR. ZELMAN:  I guess let's -- let's clarify

13    this, if you will.

14    BY MR. ZELMAN:

15        Q.   Mr. Schneider, is there one entity that is

16    sort of an umbrella organization or owns the different

17    locations?

18               MR. LEBLANC:  Objection.

19               THE WITNESS:  They were separate businesses.

20    BY MR. ZELMAN:

21        Q.   I -- I understand that.  But as -- are you the

22    owner of the business?

23        A.   The business is now closed.

24        Q.   The Bridgewater business is now closed.  When
```



ERIC SCHNEIDER 30(6)(B)                                    June 10, 2024
BARRETT vs GARAGE CARS, LLC.                                         22

1    you --

2         A.   Right.

3         Q.   When the Bridgewater business was open, were

4    you the owner?

5         A.   Yes.

6         Q.   And are you the owner of the Brockton and

7    Whitford [sic] businesses?

8         A.   I am part owner.

9         Q.   I -- I said Whitford.  I meant Whitman.  I'm

10   sorry.

11            Were you part owner of the Bridgewater?

12        A.   I'm -- I'm a little confused with the

13   question.

14        Q.   Sure.  Okay.  I think I left out a word at the

15   end there.  Were you part owner of the Bridgewater

16   business or were you full owner of that one?

17        A.   I was the owner.

18        Q.   Okay.  You were the only owner?

19            MR. LEBLANC:  Objection.

20            THE WITNESS:  Yes.

21   BY MR. ZELMAN:

22        Q.   Okay.  And the Brockton location and the

23   Whitman location, are those organized as separate

24   businesses or are they owned by one business?



```
1                MR. LEBLANC:  Objection.

2                THE WITNESS:  They are separate businesses.

3      BY MR. ZELMAN:

4           Q.   Okay.  And is there a holding company or some

5      sort of company that owns these various businesses?

6           A.   No.

7           Q.   Okay.  So going back to my questions from

8      earlier.  We were talking about during COVID times that

9      you would work virtually at the different locations as

10     needed.

11               And my question was: Were there other

12     individuals who were also doing that?

13          A.   Working from home?

14          Q.   Working virtually.

15          A.   I -- I don't remember.

16          Q.   How many employees were employed by the

17     Bridgewater location?

18          A.   One.

19          Q.   Who is that?

20          A.   Lauren Silver.

21          Q.   Who's Chris Pires?

22          A.   He would help out once in a while for the

23     location, driving some vehicles.

24          Q.   Okay.  Does he currently work at any of the
```



1  other Garage locations?

2      A.   As needed, he will drive vehicles for us, yes.

3      Q.   Okay.  Have you spoken with anyone in

4  preparation for today's deposition?

5      A.   Yes.

6      Q.   Who?  Other than your attorney, which I don't

7  want to hear.

8      A.   Nobody.  Just my attorney.

9      Q.   Have you reviewed any documents in preparation

10 for today's deposition?

11     A.   Yes.

12     Q.   What documents were those?

13     A.   The answers to the deposing of the -- of your

14 client.

15     Q.   Do you mean the deposition transcript of my

16 client?

17     A.   Yes.

18     Q.   Anything else?

19     A.   My last answers to my interrogatory questions,

20 yes.

21     Q.   All right.  Anything else?

22     A.   No.

23     Q.   All right.  Have you reviewed a copy of the

24 Complaint filed in this action?



1        A.   Yes.

2        Q.   Anything else?

3        A.   I don't think so.  I don't remember anything

4   else.

5        Q.   Have you ever reviewed a copy of the

6   deposition notice that is the reason why we're here

7   today?

8        A.   If that was in -- I believe so, yes.

9        Q.   Okay.  Anything else?

10        A.   I don't think so, no.

11        Q.   What about the documents that the Plaintiff

12   produced in this action?

13        A.   Yes, those were in there.

14        Q.   What about the documents that the Defendant

15   produced in this action?

16        A.   I believe I read those, yes.

17        Q.   Okay.  So when I asked if you reviewed any

18   documents and you say no, but then there's all these

19   documents that you have reviewed, I'm just trying to

20   make sure I have a full understanding of the documents

21   that you've reviewed.

22             Is there anything else that I haven't gone

23   over that you've looked at in preparation for today's

24   deposition?



1        A.   Not to my memory.  Possible.  I don't think

2   there's anything else that I reviewed, but.

3        Q.   Have you spoken with Mrs. Silver -- or

4   Ms. Silver, I'm sorry, with regard to this case?

5        A.    It -- it's possible I might have mentioned it

6   when it first came up.  I believe so.

7        Q.   What did you discuss with her?

8        A.   I asked her if she remembered about the

9   particular client.

10       Q.   What did she tell you?

11       A.   That she did remember and that she was -- he

12  was a good negotiator.

13       Q.   Anything else she remembered?

14       A.   I don't remember.

15       Q.   Okay.  At a certain point -- well, let me ask

16  you like this, probably a little better.  In this case,

17  The Garage produced a series of e-mails between

18  Ms. Silver and my client.

19            Did you see those?

20       A.   Yes, I did.

21       Q.   Did you ask her to put those together?

22       A.   I did.

23       Q.   When did she do that?

24       A.   I don't recall the exact date, but it was



1    after I received the Complaint.

2        Q.    Okay.  And at that time, Lauren was using the

3    e-mail, thegarageiii@comcast.net?

4        A.    I don't know.

5        Q.    Let me -- I -- I can share my screen, if that

6    would help.

7        A.    I don't know her e-mail address.

8        Q.    Sure.  So let me just put this up on the

9    screen.  Let me know when you can see it.

10       A.    Yes.

11       Q.    Do you see the documents on the screen in

12   front of you, Mr. Schneider?

13       A.    Yes, I do.

14       Q.    Okay.  And these are Bates stamped by your

15   attorney.  In the bottom right corner it says GAR 4

16   through 17.

17             Do you see that?

18       A.    Yes.

19       Q.    All right.  And these documents are a series

20   of e-mails between my client and Lauren, The Garage

21   Bridgewater.

22             Do you see that?

23       A.    Yes.

24       Q.    All right.  And the e-mail address is



1    thegarageiii@comcast.net.

2         Do you see that?

3    A.    Yes.

4    Q.    Does that refresh your recollection of the

5    e-mail address that was used by Lauren at the

6    Bridgewater location?

7    A.    No.

8    Q.    Okay.  But do you have any reason to doubt

9    that these e-mails are, in fact, Lauren's e-mails to my

10   client?

11   A.    I don't know her e-mail address.

12   Q.    I understand.  At some point, you asked Lauren

13   for her e-mails with regards to my client, correct?

14   A.    I did not ask her for her e-mails.  She gave

15   me her e-mails.

16   Q.    Okay.  And these are the e-mails that she gave

17   you?

18   A.    Yes.

19   Q.    All right.  Did you ask her for e-mails

20   relating to any of the other customers of The Garage

21   Bridgewater location?

22        MR. LEBLANC:  Objection.

23        Wait.  Wait.  You can answer.

24        THE WITNESS:  I have not.



ERIC SCHNEIDER 30(6)(B)                           June 10, 2024
BARRETT vs GARAGE CARS, LLC.                              29

```
 1   BY MR. ZELMAN:
 2        Q.   Okay.  Now, have you read through these
 3   e-mails, or do you want a moment for me to, like,
 4   slowly scroll through them so you can read it?
 5        A.   You can read it.
 6        Q.   No, I -- I've read them.  I'm saying, have you
 7   seen this before?  I don't need you to memorize it.
 8             I'm just asking, have you, you know -- do you
 9   generally know what they were discussing in these
10   e-mails?
11        A.   I have an idea.
12        Q.   Okay.  Okay.  So we can move along.  There's
13   conversations in these e-mails about the lien on the
14   vehicle, or the plates, we're picking up the vehicle,
15   and the registration, stuff like that.
16             Is that your recollection?
17        A.   Yes.
18        Q.   All right.  And Lauren would have these types
19   of conversations with other customers of the Bridgewater
20   location in order to sell them the vehicles that are
21   being sold by that location, correct?
22             MR. LEBLANC:  Objection.
23             THE WITNESS:  I don't know the conversations
24   that she had with other clients at any point in time.
```



 1  BY MR. ZELMAN:

 2      Q.    Sure.  But selling a vehicle requires a bit

 3  more work than say selling a blender, right?  There's

 4  registrations that need to be taken care of, plate

 5  transfers, lien satisfactions, recording, stuff like

 6  that.

 7          Does that all sound like something you're

 8  familiar with as being the manager and owner of The

 9  Garage?

10          MR. LEBLANC:  Objection.

11          You can answer.

12          THE WITNESS:  Each deal is different.

13  BY MR. ZELMAN:

14      Q.    But each deal involves a motor vehicle,

15  correct?

16      A.    Yes.

17      Q.    All right.  And each motor vehicle needs to be

18  registered?

19      A.    At some point.

20      Q.    And they need a license plate?

21      A.    Clients have been known to come in and have

22  their own plates with them.

23      Q.    Do you need to do any sort of arrangements or

24  just tapering of the transfer to plates or anything



1    like that?

2        A.   Each -- each transaction is -- is tailored

3    differently for each client's needs.

4        Q.   These aren't trick questions.  What I'm trying

5    to drive at here is that it's -- it's common in the

6    motor vehicle transaction to have some of this back and

7    forth, like what Lauren was doing with Mr. Barrett in

8    terms of discussing liens, or plate transfers, or

9    registration and stuff like that?

10            MR. LEBLANC:  Objection.

11            You can answer.

12            THE WITNESS:  Each customer is different.

13   BY MR. ZELMAN:

14       Q.   So you can say that it's a common thing to

15   have to deal with a registration of a vehicle upon

16   selling that vehicle?

17       A.   We -- we generally discuss these things at

18   times throughout the deal.  We know each customer's

19   need.

20       Q.   Sure.  Do you have access to the e-mail

21   address that we looked at a moment ago or does only

22   Lauren have that access?

23       A.   I -- I don't know if she has access to it.

24       Q.   Do you have access to it?



1      A.   I do not.

2      Q.   Okay.  I mean, but she still works for The

3  Garage, correct?

4           MR. LEBLANC:  Objection.  Again, let's --

5  let's be clear about -- about the language we're using.

6  BY MR. ZELMAN:

7      Q.   Well, she works at the other two Garage

8  locations at this time, correct?  That's your testimony

9  from earlier?

10     A.   She worked for our Bridgewater location that

11  is currently closed.  It's out of business.

12     Q.   I understand.  But you -- we asked earlier

13  about Ms. Silver, and you said she's still currently

14  working for the other Garage locations at this time,

15  correct?

16     A.   She does do work for us.  Yes, she does.

17     Q.   What is her role?  Or is she -- oh, actually,

18  I'm sorry.  She's still the -- the salesperson, you

19  said?

20     A.   Yes.

21     Q.   Okay.  And that's the same role she was

22  filling at the Bridgewater location?

23     A.   Yes.

24     Q.   All right.  What is Lauren's phone number?



1          MR. LEBLANC:  Objection.  I -- we're not going

2    to put that on the -- on a record.

3          MR. ZELMAN:  Okay.  We can take it off the

4    record.

5          THE WITNESS:  Well, it's a private phone

6    number that I'd rather not give out, to be quite honest

7    with you, without her permission.

8          MR. ZELMAN:  All right.  Let me ask you like

9    this -- give me a moment.  Maybe I can figure this out

10   with your counsel.

11         And Mr. LeBlanc, are -- are you representing

12   Ms. Silver as an employee of The Garage, or is this

13   someone, like, a witness that we should be contacting

14   outside of you?

15         MR. LEBLANC:  Well, Ms. Silver is neither a

16   party nor currently employed by the entity that is at

17   issue.  In addition, she has not -- her deposition

18   hasn't been noticed.  So that being the case, I will

19   discuss with my client and take -- take an official

20   position after I talk with him.

21         MR. ZELMAN:  Sure.  Okay.  So I was just

22   checking to see if you're currently representing her.

23   If she's not -- I mean, since it doesn't sound like

24   she's currently being represented by counsel,



 1  Mr. Schneider, I'll get that phone number.

 2           And Shayne, we can do this one off the record.

 3           MR. LEBLANC:  We're -- we're not giving you

 4  the phone number right now.

 5           MR. ZELMAN:  Okay.  Let me just flag this so

 6  during a break, we can call the Court.

 7           MR. LEBLANC:  I wouldn't call the Court --

 8           MR. ZELMAN:  What about --

 9           MR. LEBLANC:  I wouldn't call the Court.

10  Again, we have to conference this issue and I need to

11  talk to my client about what the ultimate decision will

12  be.

13           MR. ZELMAN:  Okay.

14           MR. LEBLANC:  So again, this is outside the --

15  outside the scope of the 30(b)(6) as the starting point.

16  But secondarily, we will -- we will take a reasoned

17  position.  We want to do a little bit of research on

18  what the both discoverability of the number would be, as

19  well as whether or not it would be appropriate for you

20  to reach out to her.

21           MR. ZELMAN:  Sure.  Again --

22           MR. LEBLANC:  I certainly can't -- I certainly

23  can't represent or say that I'm representing someone who

24  I haven't spoken with as a result of the claims at issue



 1  in the case.

 2          MR. ZELMAN:  I couldn't agree more.  I'm just

 3  saying that this is a witness identified in the initial

 4  disclosures, and if I want to get ahold of this witness,

 5  it's either through you as counsel or otherwise, I have

 6  to find her.  And --

 7          MR. LEBLANC:  Oh, you -- you -- and you can

 8  certainly -- and you can certainly ask to get ahold of

 9  her through me.  I can -- I can -- as an employee of the

10  company, I'm happy to do -- I'm happy to facilitate

11  that, but --

12          MR. ZELMAN:  Then that's fine.

13  BY MR. ZELMAN:

14      Q.   All right.  Now, Mr. Schneider, in the

15  discovery responses that we received in this case --

16  hang on.  Let me pull it up.  I don't want to misstate

17  it.  One second.

18          In response to Interrogatory number 4, the

19  Defendant responded that it sold approximately 8 to 12

20  months -- I'm sorry, 8 to 12 vehicles per month from

21  March 15, 2019 until the Bridgewater location closed

22  in December 2021.

23          Does that number sound about right to you?

24      A.   Yes.



1      Q.   All right.  And that number was consistent

2   throughout this two-and-a-half (audio interruption)?

3      A.   To the best of my memory.

4           THE REPORTER:  Counsel, just -- it cut out.

5   But I just wanted to get your question was, it was

6   consistent throughout the two-and-a-half years,

7   correct?

8           MR. ZELMAN:  Yes.

9           THE REPORTER:  Okay.  Thank you.  And the

10  witness' answer was "Yes."  Thank you.

11          THE WITNESS:  Yes, to the best of my memory.

12          THE REPORTER:  Yes.  Thank you.

13  BY MR. ZELMAN:

14     Q.   Okay.  Going to do some quick math here, one

15  second.  So there are 33 months in that time period

16  between March 2019 and December 2021.

17          Can we agree on that, or do you want to take a

18  moment to -- to calculate that?

19     A.   I would have to think that if you did it, I

20  would have to agree with you.  It sounds like pretty

21  simple math.

22     Q.   Sure.

23     A.   So I -- I would agree with you.

24     Q.   Perfect.  It's two years and nine months, so.



1    A.   Yes, right.  Yeah.

2    Q.   Okay.  Using the number at the low range,

3  which was eight cars a month, that would be roughly 264

4  cars sold, and using the number at the high range, that

5  would be roughly 396 cars sold.

6         Does that range sound about right to you?

7    A.   I'm not doing the math, but, you know, I -- I

8  can do the math for you, if you want me to.

9    Q.   I just did the math.  I'm just asking you if

10  --

11    A.   His math is right.  Okay.  There you go.

12    Q.   Okay.

13    A.   Math is correct.  There you go.

14    Q.   But I'm saying that range of vehicles sold

15  sounds about what The Garage did in business until it

16  closed in December 2021?

17    A.   Sounds close, I think.

18    Q.   Okay.

19    A.   I can't remember exactly.

20    Q.   And Lauren was the only salesperson for the

21  Bridgewater location at that time, or were there other

22  salespeople?

23    A.   I believe that we had another salesperson

24  years ago, and I don't remember -- I can't remember his



 1  name.  He was there for a short period.

 2      Q.   Would you say that Lauren was the salesperson

 3  for the vast majority of these deals?

 4          MR. LEBLANC:  Objection.

 5          THE WITNESS:  A vast majority, yes.

 6  BY MR. ZELMAN:

 7      Q.   Now, The Garage would charge a documentary

 8  preparation fee when selling these vehicles, correct?

 9      A.   Yes.

10      Q.   That documentary preparation fee was posted on

11  a paper in the office somewhere?

12          MR. LEBLANC:  Objection.

13          THE WITNESS:  It was posted on the wall.

14  BY MR. ZELMAN:

15      Q.   Where -- which wall?

16      A.   The wall that was in front of the customer

17  seating position at the time.

18      Q.   Okay.  So I've been to dealerships, but

19  they're all different, obviously.

20          So when you walk into the dealership, I assume

21  you're walking into the showroom with vehicles?

22      A.   No.  We had a front door.  You would walk in

23  through the front door.  The desk was to the right-hand

24  side.  It was very small office, and the customer would



 1  sit in front of the desk, and as they were facing the

 2  wall that was behind them, there was a sign -- there

 3  was signage on the wall right behind them, whereas

 4  they -- they couldn't miss it.  It was right there in

 5  front of them.

 6       Q.   And there was a picture produced in this

 7  action of that sign.  Was that picture -- I'm sorry.

 8            Was that picture taken of the sign at the

 9  Bridgewater location or at the sign at another location?

10       A.   At the Bridgewater location.

11       Q.   When was that picture taken?

12       A.   I don't know when it was taken, prior to us

13  closing.

14       Q.   Why was that picture taken at that time?

15       A.   I believe we were trying to get a price on

16  painting, and we found it in an old picture.

17       Q.   Okay.  So the doc fee is listed on a paper

18  that's hanging on the wall there, as you described it,

19  but when The Garage is advertising its vehicles for

20  sale online, it is not including that documentary

21  preparation fee in the advertised price of the vehicle?

22            MR. LEBLANC:  Objection.

23            You can answer.

24            THE WITNESS:  It always has.



ERIC SCHNEIDER 30(6)(B)                                    June 10, 2024
BARRETT vs GARAGE CARS, LLC.                                          40

```
 1   BY MR. ZELMAN:
 2        Q.   It always has what?
 3        A.   Listed the documentary preparation in its
 4   advertisements, to the best of my knowledge.
 5        Q.   I'm not asking you if you're listing
 6   something, saying, you know, taxes, title, doc fees
 7   extra.
 8             Is that what you're referring to?
 9        A.   The documentation fees have always been
10   advertised, to the best of my knowledge, in the
11   advertisements.
12        Q.   Advertised how?
13        A.   Stating that there's documentary fees, and
14   tax, and title, and things of such in -- in conjunction
15   with the purchase of the automobile.
16        Q.   Okay.  But my question is a little different.
17             When The Garage would advertise the price of
18   the vehicle, say this vehicle is being sold for $10,000,
19   the documentary fee would not be rolled into that
20   price.
21             That would be an additional fee that would be
22   paid at the time of purchase, correct?
23             MR. LEBLANC:  Objection.
24             THE WITNESS:  The price of the car would be
```



 1  shown, and then it would -- it was a disclaimer that

 2  states that the vehicle would have those charges on top

 3  of that price.

 4  BY MR. ZELMAN:

 5      Q.   And that was consistent throughout?  That was

 6  The Garage's practice?

 7      A.   Yeah, to the best of my memory.

 8      Q.   Okay.  Were there also times that there was no

 9  disclaimer at all regarding the additional doc fee?

10      A.   I never inspected each ad personally, but to

11  the best of my understanding, they all had that.

12           MR. LEBLANC:  And with no question pending,

13  let us take a five-minute break.

14           MR. ZELMAN:  That's fine.

15           MR. LEBLANC:  Thank you.

16           THE REPORTER:  Hearing no objection, we'll go

17  off the record.  The time is 10:26 a.m.

18           (A recess was taken.)

19           THE REPORTER:  Standby.  And we are back on

20  the record.  Time is 10:34.

21           MR. ZELMAN:  Thank you.

22  BY MR. ZELMAN:

23      Q.   All right.  I'm going to share my screen for

24  you, Mr. Schneider.  Give me one second.



ERIC SCHNEIDER 30(6)(B)                          June 10, 2024
BARRETT vs GARAGE CARS, LLC.                              42

1      A.    Okay.

2      Q.    Let me know when you can see it, please.

3      A.    I see it.

4      Q.    All right.  And I'm showing you an

5   advertisement that was produced by my client in this

6   action.  It's Bates stamped Barrett 001 and 002.

7           Do you recognize this photo, Mr. Schneider?

8      A.    I do, yes.  I recognize the car.

9      Q.    All right.  And this is a picture of the

10  advertisement as it appeared on

11  TheGarageBridgewater.com's website?

12          MR. LEBLANC:  Objection.

13          THE WITNESS:  I -- I don't remember looking at

14  it then.

15  BY MR. ZELMAN:

16     Q.    Understood.  But does this appear to be what

17  an advertisement on The Garage website would look like?

18     A.    That is exactly what it reads, so yes.

19     Q.    Okay.  You have no reason to doubt that this

20  is --

21     A.    Yeah.  I don't doubt it, no.  I see it, yes.

22     Q.    Okay.  Now, on the second page of this

23  advertisement, you have all the description of this

24  vehicle, it's specs over here.  And then below that,



 1   you have the fine print, if you will.

 2          Do you see that?

 3       A.   I -- I can see fine print.  I can't read it

 4   from here, but I see it, yes.

 5       Q.   That's fine.  So the vehicle is being

 6   advertised for sale at $14,995, correct?

 7       A.   Yes.

 8       Q.   All right.  But that does not include the

 9   documentary preparation fee, which would be charged in

10   addition at the time of sale, correct?

11       A.   Yes.

12       Q.   And there is no mention of that documentary

13   preparation fee anywhere in this advertisement; isn't

14   that true?

15       A.   I'm just reading it one more time and I don't

16   see it where it usually is.

17       Q.   Why would that be?

18       A.   I -- I don't know.  I --

19       Q.   That's it?

20       A.   What was that?

21       Q.   I didn't know if you were continuing with that

22   sentence or if you were --

23       A.   No.  I -- I don't know why it's not there.

24       Q.   Okay.  I'm just going to put another document



 1  up on the screen here.

 2          THE REPORTER:  Your mic is cutting out a

 3  little bit, Counsel.

 4          MR. ZELMAN:  Okay.  It's closer.  Let me know

 5  if that helps.

 6          THE REPORTER:  Yeah, much better.

 7  BY MR. ZELMAN:

 8      Q.   All right.  Let me know you can see this next

 9  document on your screen, Mr. Schneider.

10      A.   I see it.

11      Q.   Okay.  And this was produced as Barrett 15 and

12  Barrett 16.  It's the same advertisement, just from an

13  earlier date.

14          Again, you don't see any mention of that

15  document preparation fee in any of the fine print here

16  either, do you?

17      A.   No.

18      Q.   And again, you have no reason to doubt that

19  this document is exactly what it purports to be, which

20  is an advertisement for the sale of the 2013 Audi Q5,

21  which is the subject of this action?

22      A.   Yes.

23      Q.   Okay.  Now, how long have you -- I'm sorry.  I

24  messed that up.  Let me start again.



1          How long have you been selling cars in the

2    Commonwealth of Massachusetts for?

3          MR. LEBLANC:  Objection.  Are you talking

4    about The Garage, who we're here to be deposed today?

5    BY MR. ZELMAN:

6      Q.   How long has The Garage been in business for?

7      A.   The garage is not in business anymore.  How

8    long was The Garage Bridgewater in business for?

9      Q.   Sure.

10     A.   Five years, possibly, I think.  I'm not

11   exactly sure of the dates, but I know it closed in --

12   in December of 2021.

13     Q.   Okay.  The other Garage locations, were they

14   open before that time?

15          MR. LEBLANC:  Objection.  Outside the scope.

16   BY MR. ZELMAN:

17     Q.   Mr. Schneider?

18     A.   Yes, they were.

19     Q.   All right.

20     A.   One of them.

21     Q.   So --

22     A.   Excuse me.  One of them was and the other one

23   was not.  The other one was opened after that.

24     Q.   All right.  So just -- I'm trying to figure



 1  out how long have you been in the business of selling

 2  vehicles in the Commonwealth of Massachusetts for?

 3          MR. LEBLANC:  Objection.  We're not here for

 4  the individual deposition of Mr. Schneider.

 5          You can answer.

 6          THE WITNESS:  For years.

 7  BY MR. ZELMAN:

 8      Q.   More than 20 years?

 9      A.   About -- about that.

10      Q.   Okay.  Now, in owning and running a dealership

11  in the Commonwealth of Massachusetts, are you required

12  to keep up with the laws that apply to dealerships in

13  the Commonwealth?

14          MR. LEBLANC:  Objection.

15          And I would instruct you not to answer, unless

16  you have personal knowledge.  If the knowledge that you

17  would have obtained would have been through counsel, I

18  would instruct you not to answer.

19  BY MR. ZELMAN:

20      Q.   Mr. LeBlanc -- I mean -- I'm sorry,

21  Mr. Schneider?

22      A.   I -- I have been instructed not to answer.

23          MR. LEBLANC:  Only if -- if -- you're

24  instructed not to answer if you learned or -- or you



1   would have learned of the answer to that question from

2   counsel.  If you have independent knowledge, you may go

3   ahead and answer.

4           THE WITNESS:  So maybe you can please re-ask

5   the question.

6   BY MR. ZELMAN:

7       Q.   The question was simply: Are you aware that

8   you have to comply with the laws that pertain to

9   dealerships when running a dealership in the

10  Commonwealth of Massachusetts?  That's the question.

11      A.   I -- I know that all businesses have laws that

12  they are supposed to -- that are required, yes.

13      Q.   Okay.  And you are aware that under

14  Massachusetts law, a documentary preparation fee cannot

15  be charged unless it is included in the advertised price

16  of the vehicle; is that true?

17          MR. LEBLANC:  Objection.

18          If you would have learned that through

19  counsel, I'll instruct you not to answer it.  To the

20  extent you would have independent knowledge of such,

21  you can answer it.

22          THE WITNESS:  I -- I did -- I was not aware of

23  that.

24  BY MR. ZELMAN:



1       Q.   When did you become aware of that?

2               MR. LEBLANC:  Objection.  Calls for a legal

3    conclusion.

4               And answer his question of when you became

5    aware of it.

6               THE WITNESS:  I don't remember exactly when I

7    became aware of that.

8    BY MR. ZELMAN:

9       Q.   You became aware of it when -- well, let me

10   rephrase.

11              You were certainly aware of it once the

12   lawsuit was served and the law was cited in the

13   Complaint.  Is that fair to say?

14              MR. LEBLANC:  Objection.

15              You can answer.

16              THE WITNESS:  Please state your question one

17   more time.

18   BY MR. ZELMAN:

19      Q.   Sure.  As of the date that the Complaint was

20   served on The Garage, you were certainly aware of the

21   law, as the law was stated in the Complaint.

22              Is that a fair statement?

23      A.   Yes.

24      Q.   Okay.  Were you aware of that law prior to the

1  Complaint being served on The Garage?

2      A.   No.

3      Q.   Okay.  Now that you are aware of the law, does

4  the dealerships in Brockton and Whitman include the

5  documentary preparation fee in the advertised price of

6  the vehicle, or do they still tack it on at the time of

7  sale?

8           MR. LEBLANC:  Objection.  I'm going to

9  instruct him not to answer that question.  If you want

10 to go to court on that, you can.

11          MR. ZELMAN:  Okay.  So let me just write that

12 down, and then we will.

13          And what is the basis for instructing the

14 witness not to answer?

15          MR. LEBLANC:  You are asking a closed -- a

16 corporation that's been closed for three years to

17 testify about the practices and policies of separate

18 corporations.  It's inappropriate.  And at this point,

19 it is abusive and harassing to the process.

20          You're -- you're going on a fishing expedition

21 for other LLCs that are not at issue in this case.

22          MR. ZELMAN:  Okay.  We're a little over an

23 hour into this deposition.  Frankly, we have not a

24 whole lot left.



```
 1  BY MR. ZELMAN:
 2       Q.   Mr. Schneider, do you feel that I've been rude
 3  to you at any point in this deposition?
 4            MR. LEBLANC:  It's not about being rude,
 5  Yitzchak.  That's not what I said.
 6            MR. ZELMAN:  I understand.  The question is
 7  not for you, though.
 8            THE WITNESS:  No.
 9  BY MR. ZELMAN:
10       Q.   Have I been harassing or abusive towards you
11  during this deposition?
12       A.   Some of the questions have been slightly out
13  of line.
14       Q.   Which one's were those?
15       A.   Asking about the other entities and asking
16  about a phone number, for a personal phone number.
17            MR. ZELMAN:  All right.  Let's see what else
18  we can get done during the deposition, and then we will
19  make the call.  All right.
20            MR. LEBLANC:  What -- no.  No.  Before we do
21  this, what's your basis for making a call today?
22  Because it will be an issue that can be briefed for the
23  Court.  There's no emergency here, and I will agree on
24  the record that to the extent we submit written
```



 1  submissions to the Court, that I will -- if the Court

 2  agrees with you, I will certainly agree to produce the

 3  witness to answer those questions.

 4          I'm not, like, again, I'm saying that you're

 5  well outside the scope of the 30(b)(6).  And I think by

 6  your own admission, that that would not be included

 7  within the scope of the 30(b)(6), and that's what we're

 8  here for today.

 9          You're not entitled to go on a fishing

10  expedition during a -- during -- for other companies,

11  unrelated companies.  And -- and I think there's no

12  emergent nature to this because I am offering to bring

13  the witness back to the extent there's an issue.

14          MR. ZELMAN:  Right.  But the problem with that

15  is it -- it flips the burden, if you will, right?  It's

16  your burden to make a motion to limit or terminate the

17  deposition, should you feel that's required or

18  appropriate.

19          It's not my motion to go and compel answers to

20  questions at a deposition, which should have not been

21  instructed not to answer.  So that's the issue, but

22  again, we can address that perhaps at the break or

23  else-wise.

24          MR. LEBLANC:  Okay.



ERIC SCHNEIDER 30(6)(B)                                  June 10, 2024
BARRETT vs GARAGE CARS, LLC.                                       52

1  BY MR. ZELMAN:

2      Q.   Okay.  Going back to the sale of the vehicle

3  to my client, Mr. Schneider.  Yeah, let's -- let's

4  actually -- we'll pull up the -- the sale documents,

5  and we can go through it together.  Give me one second.

6  I'll put it on the screen.

7           All right.  Did that work?

8      A.   Yes.

9      Q.   All right.  Awesome.  Okay.  Give me one

10  second.

11          Okay.  The document on the screen in front of

12  you is GAR 1, and that is the motor vehicle purchase

13  contract for the Audi that was sold to my client by The

14  Garage.

15          Do you see that?

16     A.   Yes.

17     Q.   Okay.  The price of the vehicle was $14,700?

18     A.   Yes.

19     Q.   On top of that was charged $949.31 in

20  Massachusetts sales tax?

21     A.   That is for the -- the Department of -- the

22  registry, yes.

23     Q.   There was a $100 fee charge for title

24  preparation?



1          A.    For the Registry of Motor Vehicles, yes.

2    That's for the plates and things like that.  The $100, I

3    think, is for new plates and registration.

4          Q.    Okay.  There's a documentary preparation fee

5    of $489?

6          A.    Yes.

7          Q.    Okay.  What was that for?

8          A.    For preparing all of the documents to go to

9    the registry, the bill of sale, the odometer form, the

10   warranty form, privacy letters.  Also to make sure that

11   the vehicle got -- we paid for inspection stickers for

12   the -- for the customer at the inspection station.

13          We also take and check the vehicle to make

14   sure that it is okay, safety check.  So it covers all of

15   those areas.

16          Q.    And that's -- that's a fee that doesn't go to

17   the RMV, that goes to The Garage, correct?

18          A.    Yes.

19          Q.    All right.  The total with all the fees and

20   the sales price is $16,238.31?

21          A.    That is correct.

22          Q.    All right.  My client provided a deposit of

23   $11,500?

24          A.    Yes.



1    Q.   All right.  And then he had another $4,738.31

2  due on delivery?

3    A.   Yes.

4    Q.   And he did pay that, correct?

5    A.   Yes.

6    Q.   Okay.  And that documentary preparation fee

7  that was charged to my client, that was charged to all

8  of these customers at The Garage at the time of the

9  purchase of the -- of their vehicle, correct?

10   A.   At The Garage Bridgewater location?  Yes.

11   Q.   Yes.  Okay.  In this action, there were some

12 advertisements that were produced by The Garage.

13        Do you remember looking those over?

14   A.   I'm sorry.  What is -- what are you asking me?

15 I don't understand.

16   Q.   There were some advertisements produced by The

17 Garage.  Do you recall that?

18   A.   I would have to see those again.

19   Q.   Sure.  Let me put it up on the screen.

20   A.   Okay.

21   Q.   Okay.  So I -- on the screen in front of you

22 is what's been Bates stamped as GAR 94.  This looks like

23 the second page of the website advertisement, this time

24 for a 2014 Acura ILX?



1    A.   Yes.

2    Q.   All right.  How did The Garage go about

3    obtaining this?  Was this from the way-back machine or

4    something else?

5    A.   I believe it was in the folder of the

6    automobile.

7    Q.   Which automobile?

8    A.   The Acura ILX.

9    Q.   Okay.  Do you still have that folder?

10   A.   I believe that I might have it.  I don't know

11   for a fact.

12   Q.   Why is it that you have the folder for the

13   Acura ILX, but not the folder for any of the other

14   vehicles?

15   A.   When I went to retrieve Mr. Barrett's folder,

16   I grabbed a couple of folders at random.  Probably the

17   "A" was at the beginning for Acura.  I probably just

18   grabbed it to bring it with me.

19        I don't know why.  I just happened to do it at

20   that point in time.

21   Q.   How many other folders did you grab at that

22   time?

23   A.   I don't recall.  Maybe a couple.  I'm not

24   exactly sure.



1      Q.   Do you still have them?

2      A.   I am not sure if I still have them or not.  I

3  -- I might still have a couple of folders, yes.

4      Q.   Okay.  Next was produced a number of e-mails

5  from Autotrader.

6           Do you see that?

7           MR. LEBLANC:  Could you make it larger,

8  Yitzchak?

9           THE WITNESS:  Yeah.  Could you make it a

10  little larger, please?

11           MR. ZELMAN:  Sure.

12           THE WITNESS:  Thank you.

13  BY MR. ZELMAN:

14      Q.   Is that better?

15      A.   Yes.

16      Q.   Do you -- do you recall The Garage Bridgewater

17  getting e-mails from Autotrader with regards to leads

18  for -- for purchasers who we are interested in

19  purchasing vehicles at the Bridgewater location?

20      A.   I -- I know that leads did come in from

21  various advertising sources.

22      Q.   Including Autotrader?

23      A.   Yes.

24      Q.   Okay.  And this one is a different e-mail



1   address, it's thegaragebridgewater@gmail.com?

2        A.   I -- I can see the address.  That's

3   thegaragebridgewater@gmail.com, yes.

4        Q.   Is that an e-mail that was used by Lauren or

5   someone else at The Garage Bridgewater?

6        A.   Can only assume it was, yes.  Through the web

7   provider.  Through the Autotrader.

8        Q.   All right.  And how did -- well, let me ask

9   you like this.  Someone went through those e-mails in

10  order to produce them for this case, correct?

11       A.   I don't know where the ad -- I don't know

12  where it was from, if it was from a folder.  I don't

13  know.

14       Q.   All right.  So that -- you didn't go to that

15  e-mail and pull up these Autotrader e-mails?

16       A.   No.

17       Q.   Do you think it could have been from the

18  folder of this 2012 Ford Escape?

19       A.   I -- I don't remember.

20       Q.   Do you think Lauren would have done this?

21       A.   I don't know.  I -- I have -- I don't know.  I

22  don't -- I don't know how -- I don't -- I don't

23  remember.

24       Q.   Well, if it wasn't you and it wasn't Lauren,



1  who could it be?

2       A.   I -- I can't answer that.  I don't know.

3       Q.   By the policy of charging this documentary

4  preparation fee at the time of sale, was that policy

5  changed at any point during the time period of March

6  2019 through December 2021?

7       A.   No.

8       Q.   And the policy for advertising the price of

9  the vehicles being sold, but not including the

10  documentary preparation fee in the amount of the

11  vehicle sale price, did that policy change during the

12  time period of March 2019 through December 2021?

13           MR. LEBLANC:  Objection.

14           You can answer.

15           THE WITNESS:  My policy has always been the

16  same --

17  BY MR. ZELMAN:

18       Q.   Okay.

19       A.   -- in The Garage (audio interruption).

20           THE REPORTER:  The -- the last part of the

21  answer got cut off.  Was the -- was the witness saying

22  my policy has always been the same in The Garage

23  Bridgewater?

24           THE WITNESS:  Yes.



 1          THE REPORTER:  Okay.  Thank you.  Just wanted
 2    to make sure that last word was correct.
 3    BY MR. ZELMAN:
 4        Q.   Are you aware of the interactions that
 5    Ms. Silver, or anybody else at The Garage, had with
 6    Mr. Barrett at the time of the sale of the vehicle?
 7        A.   Not at the time of the sale.
 8        Q.   I mean, I know you said you spoke to
 9    Ms. Silver and she mentioned that Mr. Barrett was a good
10    negotiator, but other than that, did she tell you
11    anything about what occurred at the time of the sale or
12    leading up to the time of the sale?
13        A.   Only after I received the Complaint.
14        Q.   And what did she tell you, other than what
15    we've discussed already today?
16        A.   That he was very clear and understood exactly
17    what the documentation fee was; that they did have a
18    very clear trail of discussion; and that he was given a
19    discounted portion of the documentation fee because he
20    had asked for that; and that is why we discounted the
21    price she told me from 14995 to 14,7.
22          I guess she negotiated to give him half of the
23    documentation fee, as, kind of, of what he was aware of.
24    She also said that he, you know, had all of the



1    documentation to bring to his finance -- the bank that

2    financed him prior to the deal being consummated.

3        Q.   The contract that we looked at earlier, the

4    documented preparation fee is still listed as $489, but

5    the sale price of the vehicle was discounted by about

6    $295; is that right?

7        A.   Yes.

8        Q.   Okay.  Why didn't Ms. Silver just discount the

9    document preparation fee, if that's what she was trying

10   to do, in fact?

11           MR. LEBLANC:  Objection.

12           You can answer.

13           THE WITNESS:  Because everybody pays the same

14   documentation fee.

15   BY MR. ZELMAN:

16       Q.   And is it also a common practice in selling

17   vehicles that people come in and try and negotiate the

18   price of the vehicle by a couple of bucks?

19       A.   Everybody tries to save as much as they can

20   when purchasing.

21       Q.   Sure.  When The Garage Bridgewater was open,

22   did you use any sale software, such as LeasingDesk or

23   Autotrader, or anything like that?

24       A.   We -- we used Autotrader.



1        Q.    Okay.   Do you still use Autotrader?

2        A.    I --

3              MR. LEBLANC:   Objection.

4              THE WITNESS:   The business has been closed, so

5    we no longer use that.

6    BY MR. ZELMAN:

7        Q.    I understand the Bridgewater location is

8    closed.   At the other location, do you still use

9    Autotrader?

10             MR. LEBLANC:   Objection.

11             You can answer.

12             THE WITNESS:   I -- I believe we use

13   Autotrader.   I can't remember to be exactly, a couple

14   of different sources.

15   BY MR. ZELMAN:

16       Q.    Have you checked Autotrader to see if you have

17   records relating to the sale of vehicles that were done

18   at The Garage Bridgewater location?

19       A.    I'm sorry?   Say it again.   I couldn't -- you

20   broke up a little bit.

21       Q.    Have you checked the Autotrader software to

22   see if it still has any records relating to sales of

23   vehicles from The Garage Bridgewater location?

24       A.    No.



1    Q.   Why not?

2    A.   I just haven't done that.  I no longer have

3 websites up.  It's a closed business.  No more leads

4 are being generated for years.

5    Q.   Did you use any other sort of dealership

6 management software while The Garage Bridgewater was

7 open, such as AutoRaptor and AutoManager, anything like

8 that?

9    A.   We -- we had -- yes.  And I'm trying -- I -- I

10 can't remember the name of it, but I -- I know we had a

11 -- I know we had a service there.  I just don't remember

12 the exact name of it.

13    Q.   Okay.  Who -- who would remember that?  Would

14 that be Lauren?

15    A.   I --

16         MR. LEBLANC:  Objection.

17         You can answer.

18         THE WITNESS:  Yeah.  I -- she would probably

19 remember that.

20 BY MR. ZELMAN:

21    Q.   (Audio interruption) whichever one it was --

22         THE REPORTER:  Sorry, counsel, could you

23 start --

24         MR. LEBLANC:  Start your question.  You broke



1  up completely at the beginning.

2  BY MR. ZELMAN:

3      Q.   My apologies.  If you were to access that

4  software, whatever software it is, you'd be able to see

5  the records of the vehicles that were sold at The Garage

6  back before it closed?  And again, I'm referring to the

7  Bridgewater location.

8           MR. LEBLANC:  Objection.

9           You can answer.

10          THE WITNESS:  I don't know.

11  BY MR. ZELMAN:

12     Q.   And that's because you haven't tried to look?

13     A.   Yes.

14          MR. ZELMAN:  Looking through my list of

15  questions here to see what I still have for you.  Give

16  me a moment.

17          MR. LEBLANC:  You want us to take a few-minute

18  break so you can do that?

19          MR. ZELMAN:  We can do it either way.  Just I

20  want to --

21          MR. LEBLANC:  I know you want to have a

22  discussion about the other question that's outstanding,

23  and I'd like to talk to my client about it so.

24          MR. ZELMAN:  Sure.  Why don't we take five



```
 1  minutes, come back at 11:15 or so.  Just, I'm wrapping

 2  up anyway.

 3            MR. LEBLANC:  Great.  Sounds --

 4            THE REPORTER:  Hearing no objection, we'll go

 5  off the record.  Time is going on 11:11 a.m.

 6            (A recess was taken.)

 7            THE REPORTER:  We are back on the record.

 8  Time is 11:22 a.m.

 9            MR. LEBLANC:  So before going back or going

10  back to Attorney Zelman's questions, I've had the

11  opportunity to talk with my client about the two kind

12  of outstanding issues in the deposition.

13            The first being Lauren Silver, and I've

14  offered Attorney Zelman the piece of information that I

15  will be representing her as an employee of The Garage

16  Bridgewater.  Thus, any contact that he intends to make

17  should be done through me.

18            And second, with regard to the question about

19  the two nonparty entities and their policy relating to

20  documentary preparation fees and advertisements, I will

21  allow the witness to answer that single question, with

22  the reservation that we won't allow further questions

23  for unrelated unnamed entities.

24            The witness -- he clearly was not
```



1  contemplated, those topics were clearly not contemplated

2  in the 30(b)(6), and the witness wasn't prepared to

3  testify to them.

4          Given the fact that we have that one question

5  pending, and in an effort to act in the spirit of

6  cooperation as discovery requires us to, I will allow

7  the witness to answer that one question, but given the

8  position any further questions, we will view as further

9  harassment.  So we're going to ask that it be limited to

10  that one question.

11          MR. ZELMAN:  Okay.

12  BY MR. ZELMAN:

13      Q.   So let's just get that out of the way then.

14          Mr. Schneider, do you know the answer to that

15  question?

16      A.   Yes, I do.

17      Q.   And what is the answer?

18      A.   The answer is that the advertisements have a

19  disclosure at the end of each of them explaining how the

20  fees are charged.

21      Q.   So the same type of disclaimer we saw earlier

22  on the advertisements today?

23      A.   Yes.

24      Q.   Okay.  Let me go back here.



1          MR. LEBLANC:  And we did offer -- Attorney

2   Zelman, there is a correction for the question --

3   BY MR. ZELMAN:

4       Q.   Oh, yeah.  You had a correction to the

5   software -- a correction to the software question I had

6   asked you before the break?

7       A.   Yes.

8       Q.   What was -- what's your correction?

9       A.   I have reached out to our provider for the

10  automobile billing that we've done through there, and

11  he no longer has any records of any of the deals that

12  were put through the Bridgewater location.

13      Q.   Which provider is that?

14      A.   CARPRO.

15      Q.   CARPRO?

16      A.   Yes.

17      Q.   Now, in response to our request for

18  production, there were supplemental responses served

19  where we asked for records reflecting documentary

20  preparation fees that were paid by these customers or

21  that were obtained by the Defendant within the relevant

22  time period.

23          And the supplemental response to that request

24  was that there are three documents that are being



 1    withheld from the production at this time.

 2              Do you know what those three documents are?

 3        A.    I'm not understanding the question.

 4        Q.    Sure.  Let me share my screen.  In response to

 5    Plaintiff's request for production of documents, there

 6    was a number of supplemental responses served where the

 7    Defendant responded that it's withholding three

 8    documents because, "the Court has not certified

 9    Plaintiff's proposed class and the production of these

10    documents would result in disclosure of personal

11    identifying information for putative class members

12    prior to a ruling on class certification in Plaintiff's

13    favor."

14              Do you know what those three documents that

15    are --

16              MR. LEBLANC:  Objection.

17              To the extent you only would have learned of

18    the identification of the three documents through

19    counsel, I would instruct you not to answer.

20    BY MR. ZELMAN:

21        Q.    Mr. Schneider?

22              MR. LEBLANC:  I'm instructing him not to

23    answer.  Objections and withholding documents from

24    discovery are in the purview of the lawyer.



 1          MR. ZELMAN:  Okay.  So I guess we will need to

 2   confer on that after this.

 3          All right.  So that's all my questions for you

 4   today, Mr. Schneider.

 5          Unless it opens anything up for you, Mr.

 6   LeBlanc, then you'll be free to go.

 7          MR. LEBLANC:  I have no questions at this

 8   time.

 9          MR. ZELMAN:  Okay.  Then thank you for your

10   time, Mr. Schneider.

11          THE WITNESS:  Thank you.

12          THE REPORTER:  Thank you.  All right.  Before

13   -- prior to closing out this record, I'll just secure

14   transcript orders.

15          Mr. Zelman, will you be ordering today's

16   transcript?

17          MR. ZELMAN:  Yes.

18          THE REPORTER:  And is ten business days --

19          MR. ZELMAN:  Electronic only.

20          THE REPORTER:  -- sufficient?  I'm sorry?

21          MR. ZELMAN:  Electronic only.

22          THE REPORTER:  Yes.  And ten business days is

23   okay?

24          MR. ZELMAN:  For now.  I may speed that up.



 1   We're going to --

 2              THE REPORTER:  Okay.

 3              MR. ZELMAN:  I'm going to talk to Mr. LeBlanc

 4   after this, anyway.

 5              THE REPORTER:  All right.  If that's the case,

 6   just reach out to Esquire, then.

 7              And then for Mr. LeBlanc, I'll assume you'll

 8   be ordering a copy.  As you said, the witness will be

 9   wanting the 30 days to read and sign.

10              Is that the case?

11              MR. LEBLANC:  Correct.

12              THE REPORTER:  Okay.

13              MR. LEBLANC:  Electronic -- electronic only is

14   fine.

15              THE REPORTER:  Electronic only.  And would you

16   prefer the read and sign be sent to you or to the

17   witness directly?

18              MR. LEBLANC:  Please send it to me.

19              THE REPORTER:  Understood.  And that is

20   everything from my end.  We will close out this record.

21   Time is just past 11:29 a.m.

22              MR. ZELMAN:  Thank you.

23              (The deposition concluded at 11:29 a.m.)

24



```
 1                      CERTIFICATE OF REPORTER

 2

 3           I, Shayne Colomy, a Digital Reporter and

 4   Notary Public in and for the State of New Jersey, do

 5   hereby certify:

 6

 7           That the foregoing witness was not sworn;

 8   that the proceeding took place before me at the time

 9   and place herein set forth; that the testimony and

10   proceedings were accurately captured with annotations

11   by me during the proceeding.

12

13           I further certify that I am not related to

14   any of the parties to this action by blood or marriage

15   and that I am not interested in the outcome of this

16   matter, financial or otherwise.

17

18           IN WITNESS THEREOF, I have hereunto set my

19   hand this 18th day of June, 2024.

20

21

22                    Shayne Colomy
                      _____
23                    Shayne Colomy
                      Notary Commission New Jersey No. 50205784
24                    Commission Expires: January 15, 2028
```



1                 CERTIFICATE OF TRANSCRIPTIONIST

2

3           I, Jacqueline Poolton, Certified Shorthand

4     Reporter/Registered Professional Reporter, do hereby

5     certify:

6               That the foregoing is a complete and true

7     transcription of the original digital audio recording

8     of the testimony and proceedings captured in the

9     above-entitled matter.  As the transcriptionist, I

10    have reviewed and transcribed the entirety of the

11    original digital audio recording of the proceeding to

12    ensure a verbatim record to the best of my ability.

13              I further certify that I am neither attorney

14    for nor a relative or employee of any of the parties

15    to the action; further, that I am not a relative or

16    employee of any attorney employed by the parties

17    hereto, nor financially or otherwise interested in the

18    outcome of this matter.

19              IN WITNESS THEREOF, I have hereunto set my

20    hand this 20th day of June, 2024.

21

22              *Jacqueline Poolton*

23              _____
                Jacqueline Poolton, CSR/RPR

24



1                    DEPOSITION ERRATA SHEET

2

3   Assignment No. J11353638

4   Case Caption: MICHAEL BARRETT, ON BEHALF OF HIMSELF AND
    ALL OTHERS SIMILARLY SITUATED vs. THE GARAGE CARS, LLC
5   D/B/A THE GARAGE

6

7             DECLARATION UNDER PENALTY OF PERJURY

8       I declare under penalty of perjury that I have

9   read the entire transcript of my deposition taken in

10  the above-captioned matter or the same has been read

11  to me, and the same is true and accurate, save and

12  except for changes and/or corrections, if any, as

13  indicated by me on the DEPOSITION ERRATA SHEET

14  hereof, with the understanding that I offer these

15  changes as if still under oath.

16

17           Signed on the _____ day of _____,

18  2024.

19

20

21

22

23       _____

24       ERIC SCHNEIDER



ERIC SCHNEIDER 30(6)(B)                    June 10, 2024
BARRETT vs GARAGE CARS, LLC.                        73

```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24             ERIC SCHNEIDER
```



ERIC SCHNEIDER 30(6)(B)                                    June 10, 2024
BARRETT vs GARAGE CARS, LLC.                                        74

```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24              ERIC SCHNEIDER
```

